**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| **MAURICE WILLIAMS,** | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:20-cv-274** |
| | § | |
| **GALVESTON COUNTY, TEXAS, and** | § | |
| **EUSEBIO ALVAREZ,** | § | |
| **In his individual capacity,** | § | |
| *Defendants*. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, MAURICE WILLIAMS, Plaintiff, complaining of GALVESTON COUNTY, TEXAS and EUSEBIO ALVAREZ, in his individual capacity, and for causes of action will respectfully show unto the Court as follows:

## I.
## PARTIES

1.     Plaintiff Maurice Williams is an individual who resides in Jefferson County, Arkansas.

2.     Defendant Galveston County, Texas is a political subdivision of the State of Texas located in the Southern District of Texas. Galveston County, Texas can be served through its County Judge, Mark Henry, at 722 Moody, Suite 200, Galveston, Texas 77550, or wherever he may be found.

3.     Defendant Eusebio Alvarez is an individual residing in Galveston County, Texas, and may be served at his place of employment at the Galveston County Sheriff's Office located at 601 54th St, Galveston, TX 77551, or wherever he may be found. He is being sued in his individual capacity.

## II.
## JURISDICTION AND VENUE

4.      The Court has original jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

5.      Venue is proper in the Southern District of Texas pursuant to 28 U.S.C.

§ 1391 because the Defendants are domiciled and/or reside in the Southern District of

Texas, and all or a substantial part of the cause of action accrued in the Southern District

of Texas.

## III.
## FACTS AND ALLEGATIONS

6.      "It is well established that prison officials have a constitutional duty to

protect prisoners from violence at the hands of their fellow inmates." *Morgan v. Hubert*,

335 F. App'x 466, 470 (5th Cir. 2009); quoting, *Longoria v. Texas*, 473 F.3d 586, 592 (5th

Cir.2006).

7.      People who are incarcerated at the Galveston County Jail are dependent

upon Galveston County and its employees to provide them with protection from violence

at the hands of their fellow inmates.

8.      Under Texas law, sheriffs are "final policymakers" in the area of law

enforcement for the purposes of holding a county liable under § 1983. *James v. Harris

Cty.*, 577 F.3d 612, 617 (5th Cir. 2009); citing *Williams v. Kaufman County*, 352 F.3d 994,

1013 (5th Cir.2003).

9.      Sheriff Henry Trochesset is the Galveston County Jail's final policymaker

and has been delegated policy-making authority by the Galveston County Commissioners

Court.

10.     As Sheriff, Trochesset was responsible for staffing the Galveston County Jail as he is the keeper of the jail.

11.     The sheriff of each county is the keeper of the county jail. The sheriff shall <u>safely</u> keep all prisoners committed to the jail by a lawful authority, subject to an order of the proper court. Tex. Loc. Gov't Code Ann. § 351.041.

12.     The sheriff has all the powers, duties, and responsibilities with regard to keeping prisoners and operating the jail that are given by law to the sheriff in a county operating its own jail. Tex. Loc. Gov't Code Ann. § 351.035.

13.     At all times during his confinement in the Galveston County Jail that make the basis of this lawsuit, Plaintiff was classified as a pre-trial detainee.

14.     Plaintiff was housed in pod C200, which housed 48 inmates.

15.     Due to Sheriff Trochesset's staffing policies, the Galveston County Jail does not have an adequate number of officers in each pod to ensure the safety and protection of the inmates.

16.     Sheriff Trochesset's official policy is to have one officer in each pod unless there is an officer training another officer, then there will be two officers in the pod.

17.     As a result of Sheriff Trochesset's policy, it was the custom and practice of the Galveston County Jail to only have one officer – or no officer – in each pod at any given time, which left the pods understaffed to the point where inmates could not be adequately protected from inmate-on-inmate assaults.

18.     On October 20, 2018, pursuant to Sheriff Trochesset's policy and the Galveston County Jail's custom and practice, Defendant Eusebio Alvarez was the only officer in Plaintiff's pod because he was not training another officer.

19.     This meant that Defendant Alvarez was responsible for supervising all 48 inmates, who were free to move about the pod.

20.     It was impossible for Defendant Alvarez to monitor all 48 inmates at once, due to the large number of inmates and the number of different areas in the pod that the inmates could be located.

21.     In one area of the pod, there was a living quarters containing 32 sets of bunk beds where inmates slept.

22.     In another area of the pod, there was a dining area with approximately twelve tables where the inmates ate, socialized, and watched television.

23.     In another area of the pod, there was a shower and toilet area.

24.     In another area of the pod, there was a phone bank with approximately six phones that could be used by the inmates.

25.     At the front of the pod, next to the door leading into the pod, there is a desk where the officer sits.

26.     The officer also is required to patrol the pod for the purpose of monitoring the inmates throughout the pod.

27.     The officer, in this case Defendant Alvarez, was responsible for supervising all 48 inmates in each area of the pod.

28.     However, it is physically impossible for one officer to accomplish this task as one officer does not have a vantage point of the entire pod and cannot see what each inmate is doing at all times.

29.     If an officer is at the officer desk, he is too far away from the inmate areas to meaningfully protect inmates by intervening in an inmate-on-inmate assault before harm has been done.

30.     Additionally, depending on the situation, one officer may not be sufficient to intervene in the inmate-on-inmate assault and would need to request backup from officers not already in the pod.

31.     This time waiting for additional officers delays adequate officer intervention and prolongs the inmate-on-inmate assault, increasing the number and severity of injuries caused by the assault.

32.     Inmates can see where the pod officer is located in the pod, letting them know whether the officer is supervising them or if he is close enough to attempt to immediately stop an assault at the time.

33.     On October 20, 2018, Mr. Williams was assaulted by inmate James Smith in pod C200.

34.     At the time, pursuant to Sheriff Trochesset's policy and the Galveston County Jail's custom and practice of having only one officer in each pod, Defendant Alvarez was the only officer in the pod.

35.     This policy, custom, and practice of having only one officer in a pod was promulgated by Sheriff Trochesset, who was the final policymaker, and thus constituted the official policy of Defendant Galveston County.

36.     On that date, Mr. Williams walked over to his bunk in the living quarters area to grab a book.

37.     Inmate Smith followed behind him and attacked him with a sharpened piece of glass.

38.     Inmate Smith stabbed Mr. Williams six or seven times with the sharpened piece of glass, cutting his nose and eye.

39.     Inmate Smith struck Mr. Williams multiple times with his fists.

40. Defendant Alvarez saw inmate Smith assaulting Mr. Williams.

41. Defendant Alvarez was at his desk at the front of the pod when this assault occurred in the living quarters area of the pod.

42. Defendant Alvarez could have been patrolling the pod for the purpose of monitoring the inmates throughout the pod, which could have prevented the assault.

43. Due to being at his desk, Defendant Alvarez was too far away from the assault to immediately intervene.

44. Defendant Alvarez could have gone over to the assault and intervened when he saw it occurring.

45. However, when Defendant Alvarez realized the assault was occurring, he did not react in any way to stop the assault, but instead sat watching the assault continue.

46. After watching the assault continue, instead of intervening, Defendant Alvarez called for backup to come from another pod, because he was the only officer in pod C200 at the time due to Galveston County's policy, custom, and practice of understaffing the pods with only one officer in each pod.

47. Defendant Alvarez waited for officers to arrive from another pod before they became involved in the assault.

48. While waiting for officers to arrive, Defendant Alvarez did not intervene in the assault, instead, allowing it to continue uninterrupted.

49. This period of waiting for other officers to arrive prolonged the assault, including the amount and severity of Mr. Williams' injuries.

50. Due to the Galveston County Jail's policy, custom, and practice of having only one officer in pod C200, the Galveston County Jail was unable to protect Mr.

Williams as required by law. *Morgan*, 335 F. App'x 466, 470 (5th Cir. 2009); quoting *Longoria*, 473 F.3d 586, 592 (5th Cir.2006).

51.     Defendant Alvarez failed to protect Mr. Williams by failing to intervene when Defendant Alvarez became aware that Mr. Williams was being assaulted, and instead watching the assault occur and then calling for and waiting on backup to come from another pod.

52.     Following the assault, Mr. Williams was taken to the hospital due to the gravity of his wounds.

53.     Mr. Williams' nose was sliced open to the point of needing stitches on the inside before stitches were placed on the outside of his nose.

54.     Mr. Williams has a permanent scar on his nose as a result.

55.     Mr. Williams' head was sliced open and needed stitches from the top of his head to his forehead.

56.     Mr. Williams has a permanent scar on his head as a result.

57.     Mr. William's eyebrow was sliced open and needed stitches.

58.     Mr. William's eyebrow has a permanent scar as a result.

59.     Mr. Williams required surgery on his right eye as a result of the assault.

60.     However, Mr. Williams is now completely blind in his right eye as a result of this assault.

61.     The inmate that assaulted Mr. Williams, inmate James Smith, had a history of violent behavior in the Galveston County Jail that was known to the Galveston County Jail prior to his assault on Mr. Williams.

62.     The reason that inmate Smith was in pod C200 was because he had assaulted another inmate in a different pod and was moved to pod C200.

63.     The Galveston County Jail was aware of the violent proclivities of inmate Smith due to moving him after the previous assault.

64.     However, Galveston County Jail chose to house him in pod C200 with only one officer in the pod, which was inadequate to protect inmates, such as Mr. Williams, from inmate Smith.

65.     In the ten months that Mr. Williams had been in pod C200 of the Galveston County Jail, there had been at least seven other inmate-on-inmate assaults in that pod alone, which all occurred while there was only one officer assigned to the pod.

66.     Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate Lamar Turner was involved in two inmate-on-inmate assaults in pod C200 while there was only one officer supervising the pod.

67.     Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Mitchell" was involved in an inmate-on-inmate assault involving a weapon in pod C200 while there was only one officer supervising the pod.

68.     Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Bergus" was involved in an inmate-on-inmate assault in pod C200 while there was only one officer supervising the pod.

69.     Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Peanut" was involved in an inmate-on-inmate assault in pod C200 while there was only one officer supervising the pod.

70.     Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Mays" was involved in an inmate-on-inmate assault which resulted in his shoulder being broken in pod C200 while there was only one officer supervising the pod.

71.     Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Pee Wee" was involved in an inmate-on-inmate assault in pod C200 while there was only one officer supervising the pod.

72.     Each of these inmate-on-inmate assaults were stopped by Galveston County jailers; thus, the Galveston County Jail was aware of each assault.

73.     Upon information and belief, discovery into information within the knowledge of Defendant Galveston County will show more details regarding these seven inmate-on-inmate assaults.

74.     Upon information and belief, discovery into information within the knowledge of Defendant Galveston County will show that there were more inmate-on-inmate assaults in the Galveston County Jail while there was only one officer assigned to a pod, which put Galveston County on notice that their policy, custom, and practice of understaffing the jail pods with only one officer was failing to protect inmates in violation of their constitutionally protected rights under the Fourteenth and Eighth Amendments to the United States Constitution. *Morgan*, 335 F. App'x 466, 470 (5th Cir. 2009); quoting *Longoria*, 473 F.3d 586, 592 (5th Cir.2006).

75.     "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities..." *Hicks–Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017)).

76.     The sheriff of each county is the keeper of the county jail. The sheriff shall <u>safely</u> keep all prisoners committed to the jail by a lawful authority, subject to an order of the proper court. Tex. Loc. Gov't Code Ann. § 351.041.

77.    The sheriff has all the powers, duties, and responsibilities with regard to keeping prisoners and operating the jail that are given by law to the sheriff in a county operating its own jail. Tex. Loc. Gov't Code Ann. § 351.035.

78.    Had Sheriff Trochesset properly exercised his responsibilities as keeper of the jail, he would have been on notice that that inmate-on-inmate assaults continued to occur while there was only one officer assigned to the pod. *Hicks–Fields*, 860 F.3d at 808; Tex. Loc. Gov't Code Ann. §§ 351.041, 351.035.

79.    Thus, prior to October 20, 2018, Galveston County, through Sheriff Trochesset, was thus on notice that inmate-on-inmate assaults continued to occur while there was only one officer assigned to the pod.

80.    However, Sheriff Trochesset did not change the Galveston County Jail staffing policy, and the Galveston County Jail failed to protect Mr. Williams as a result.

81.    As Sheriff, Trochesset was aware of the inadequate staffing issues at the Galveston County Jail since he made the staffing policies, he was responsible for safely keeping the prisoners committed to his jail, and there had been numerous inmate-on-inmate assaults in pods with only one officer supervising the pod in the months leading up to Mr. Williams assault.

82.    As Sheriff, Trochesset holds a Jailer Certification and was aware that having multiple officers in each of the pods acted as a deterrent to inmate assaults and allowed for quickly diffusing inmate altercations.

83.    However, Sheriff Trochesset attempted to appeal to his constituents by enacted staffing policies at the Galveston County Jail intended to "modif[y] Jail shift schedules to improve efficiencies and reduce overtime costs." Re-Elect Henry Trochesset

for Sheriff, Accomplishments, http://henrytforsheriff.com/accomplishments/, (last visited Aug. 21, 2020).

84. The method used by Sheriff Trochesset to "improve efficiencies and reduce overtime costs" was to understaff the Galveston County Jail by having only one officer in each pod, despite the increased risk to inmates.

85. As Sheriff, Trochesset was aware that due to this Galveston County policy of understaffing, there were periods of time with only one officer supervising each pod – including pod C200.

86. As Sheriff, Trochesset was aware that if there were not enough officers working in the jail so that there would be multiple officers supervising each pod – including pod C200 – then those pods would lack sufficient officer presence for deterring inmate assaults and quickly diffusing inmate altercations.

87. Despite this knowledge, Sheriff Trochesset, intentionally understaffed the Galveston County jail in order to have a friendlier budget to help with his re-election bid, which meant that pods – including pod C200 – would frequently have only one pod officer.

88. This staffing decision by Henry Trochesset caused there to be only one officer supervising pod C200 on October 20, 2018 when Mr. Williams was assaulted by inmate Smith.

89. The assault on Plaintiff lasted for over a minute.

90. For over a minute Plaintiff was stabbed and punched.

91. The assault occurred because there was not sufficient pod officer presence to monitor the inmates and deter inmate violence because there was only one pod officer – Defendant Alvarez – and he was sitting at his desk at the front of the pod and could not

monitor what was happening in the living quarter area with an ability to successfully deter inmate-on-inmate assaults on his own.

92.     The assault lasted as long as it did because there was not sufficient pod officer presence where the assault was occurring, Defendant Alvarez did not intervene when he saw the assault occurring, and Defendant Alvarez waited for officers to come from another pod before intervening in the assault.

93.     If multiple officers would have been present in pod C200 on October 20, 2018, inmate Smith would have been deterred from attacking Mr. Williams because if there were multiple officers in the pod then they would have been able to monitor more of the pod than a single officer, including having multiple officers stationed in different areas of the pod instead of just having one officer – Defendant Alvarez – stationed at the officer desk at the front of the pod.

94.     If multiple officers would have been present in pod C200 on October 20, 2018 and inmate Smith still had decided to assault Mr. Williams, the officers would have been able to intervene and the assault would have ended much sooner than it did because they would not have had to wait for other officers to come from another pod, which would have resulted in fewer and less severe injuries to Mr. Williams.

95.     If Defendant Alvarez would have intervened immediately instead of watching, then calling for backup from another pod, and waiting for that backup to arrive before intervening, the assault would have ended much sooner than it did, which would have resulted in fewer and less severe injuries to Mr. Williams.

96.     The Defendants were at all times acting under the color of law.

**IV.**

**CAUSES OF ACTION**

**COUNT I**

**FAILURE TO PROTECT**
**Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983**
**Eusebio Alvarez**

97.     The Fourteenth Amendment's Due Process Clause protects the rights of pretrial detainees. *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996).

98.     Detention center officials have a duty, under the Fourteenth Amendment, to protect the detainees in their custody. *Cantu v. Jones*, 293 F.3d 839, 844 (5th Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)); *Bell v. Wolfish*, 441 U.S. 520, 535, 545 (1979) (pretrial detainees retain at least those constitutional rights prisoners enjoy).

99.     At all times relevant to this lawsuit, Mr. Williams was a pre-trial detainee in the Galveston County Jail.

100.     An official violates a detainee's constitutional rights if the official is deliberately indifferent to a substantial risk of serious harm to the inmate. *Farmer*, 511 U.S. at 847.

101.     As there is no constitutionally significant distinction between the rights of pretrial detainees and convicted inmates to basic human needs, including protection from violence, a state jail official's constitutional liability to pretrial detainees for episodic acts or omissions should be measured by a standard of subjective deliberate indifference as enunciated by the Supreme Court in *Farmer*. *Hare*, 74 F.3d at 643 (5th Cir. 1996).

102.     A plaintiff must allege facts that show (1) that the official knew of and

disregarded an excessive risk to inmate health or safety; (2) that the officer was both aware of facts from which he could infer that a substantial risk of serious harm exists and actually made that inference, and (3) failed to take reasonable measures to abate the risk. *Farmer*, 511 U.S. at 842-45; *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003); *Hare*, 74 F.3d at 648.

103.    The requisite knowledge of substantial risk can be established through circumstantial evidence creating a rebuttable inference. *Farmer*, 511 U.S. at 842. An official may be aware of a substantial risk of harm without being specifically aware that the plaintiff was especially likely to be assaulted by the specific prisoner who eventually committed the assault. *Id.* at 843. Officials who are aware of general, obvious, substantial risks and do not take reasonable measures to abate them can be found liable. *Id.* at 844.

**1. Defendant Alvarez knew of and disregarded an excessive risk to inmate health or safety.**

104.    Defendant Alvarez saw inmate Smith assault Mr. Williams.

105.    Defendant Alvarez could have gone over to the assault and intervened when he saw it occurring.

106.    However, when Defendant Alvarez realized the assault was occurring, he did not react in any way to stop the assault, but instead sat watching the assault continue.

107.    After watching the assault continue, instead of intervening, Defendant Alvarez called for backup to come from another pod, because he was the only officer in pod C200 at the time due to Galveston County's policy, custom, and practice of understaffing the pods with only one officer in each pod.

108.    Defendant Alvarez waited for officers to arrive from another pod before they became involved in the assault.

109.    While waiting for officers to arrive, Defendant Alvarez did not intervene in the assault, instead, allowing it to continue uninterrupted.

110.    This period of waiting for other officers to arrive prolonged the assault, including the amount and severity of Mr. Williams' injuries.

111.    If Defendant Alvarez would have intervened immediately instead of watching, then calling for backup from another pod, and waiting for that backup to arrive before intervening, the assault would have ended much sooner than it did, which would have resulted in fewer and less severe injuries to Mr. Williams.

112.    Thus, Defendant Alvarez was aware of an excessive risk to Mr. Williams since he saw inmate Smith assaulting Mr. Williams, and Defendant Alvarez disregarded that excessive risk by watching it occur, choosing not to intervene, and waiting for backup to come from another pod before attempting to intervene, which allowed the assault to continue.

**2. Defendant Alvarez was both aware of facts from which he could infer that a substantial risk of serious harm existed and actually made that inference.**

113.    Defendant Alvarez saw inmate Smith assaulting Mr. Williams with a blade of glass.

114.    After watching the assault continue, instead of intervening, Defendant Alvarez called for backup to come from another pod, because he was the only officer in pod C200 at the time due to Galveston County's policy, custom, and practice of understaffing the pods with only one officer in each pod.

115.    Defendant Alvarez waited for officers to arrive before

they became involved in the assault.

116. Thus, Defendant Alvarez was aware of facts from which he could infer tha that a substantial risk of serious harm existed because he saw inmate Smith assaulting Mr. Williams with a blade of glass.

117. Defendant Alvarez actually made that inference because he called for backup to intervene in the assault.

### 3. Defendant Alvarez failed to take reasonable measures to abate the risk.

118. Defendant Alvarez saw inmate Smith assault Mr. Williams with a blade of glass.

119. Defendant Alvarez could have gone over to the assault and intervened when he saw it occurring.

120. However, when Defendant Alvarez realized the assault was occurring, he did not react in any way to stop the assault, but instead sat watching the assault continue.

121. After watching the assault continue, instead of intervening, Defendant Alvarez called for backup to come from another pod, because he was the only officer in pod C200 at the time due to Galveston County's policy, custom, and practice of understaffing the pods with only one officer in each pod.

122. Defendant Alvarez waited for officers to arrive from another pod before they became involved in the assault.

123. While waiting for officers to arrive, Defendant Alvarez did not intervene in the assault, instead, allowing it to continue uninterrupted.

124. This period of waiting for other officers to arrive prolonged the assault, including the amount and severity of Mr. Williams' injuries.

125.    If Defendant Alvarez would have intervened immediately instead of watching, then calling for backup from another pod, and waiting for that backup to arrive before intervening, the assault would have ended much sooner than it did, which would have resulted in fewer and less severe injuries to Mr. Williams.

126.    Thus, because Defendant Alvarez was aware that Mr. Williams was being assaulted, could have intervened, but instead sat watching the assault, then called for backup from another pod, but waiting for that backup to arrive before intervening, Defendant Alvarez failed to take reasonable measures to abate the risk to Mr. Williams as he was being actively assaulted by another inmate.

127.    Defendant Alvarez's deliberate indifference to Mr. Williams' safety by watching the assault, then calling for backup from another pod, but waiting for that backup to arrive before intervening, was the direct and proximate cause of Mr. Williams' injuries, as the assault would have ended much sooner than it did, which would have resulted in fewer and less severe injuries to Mr. Williams, had Defendant Alvarez act in accordance with his duty to protect Mr. Williams by intervening in the assault.

128.    As a direct, proximate, and foreseeable result of Defendant Alvarez's actions, Mr. Williams suffered injuries and damages, including, physical injuries, pain and suffering, permanent physical disfigurement, blindness, and mental anguish.

## COUNT II

### DELIBERATE INDIFFERENCE AND CAUSES OF ACTION UNDER
### *Monell v. New York City Department of Social Services*
### Violations of the 14th Amendment Pursuant to 42 USC § 1983
### Galveston County

129.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

130.    Municipalities, including counties and cities, may be held liable under § 1983. *Hampton Co. Nat'l Sur., LLC v. Tunica Cty.*, 543 F.3d 221, 224 (5th Cir. 2008).

131.    A municipality may be liable under § 1983 if the execution of one of its customs or policies deprives a plaintiff of his or her constitutional rights. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978).

132.    Municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).

133.    "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

134.    The plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984).

135.    A municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks–Fields*, 860 F.3d at 808.

136.    To establish municipal liability under § 1983 based on an alleged "persistent widespread practice or custom that is so common it could be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown." *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) (citing *Hicks–Fields*, 860 F.3d at 808).

137.    "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities…" *Hicks–Fields*, 860 F.3d at 808.

138.    The Fourteenth Amendment's Due Process Clause protects the rights of pretrial detainees. *Hare*, 74 F.3d at 639 (5th Cir. 1996).

139.    Detention center officials have a duty, under the Fourteenth Amendment, to protect the detainees in their custody. *Cantu*, 293 F.3d at 844 (5th Cir. 2002) (citing *Farmer*, 511 U.S. at 833 (1994)); *Bell*, 441 U.S. at 535, 545 (1979) (pretrial detainees retain at least those constitutional rights prisoners enjoy).

140.    A challenge to a condition of confinement is a challenge to general conditions, practices, rules, or restrictions of pretrial confinement, and the constitutional issue is whether the condition is reasonably related to a legitimate governmental objective.

141.    A government entity may also incur § 1983 liability for episodic acts and omissions injurious to a pretrial detainee if the plaintiff first proves that County officials or employees, acting with subjective deliberate indifference, violated his constitutional rights and then establishes that the County employee's acts resulted from a municipal policy or custom adopted with objective indifference to the detainee's constitutional rights. *Sanchez v. Young Cty., Tex.*, 866 F.3d 274, 280 (5th Cir. 2017). The County acts

with objective deliberate indifference if it promulgates a custom or policy despite the known or obvious consequences that a constitutional violation would result. *Id.*

142.    There is no rule barring a plaintiff from pleading both alternative theories, and a court may properly evaluate each separately. *Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 464 (5th Cir. 2015).

143.    Plaintiff brings this cause of action against Galveston County under alternate theories of Condition of Confinement and Episodic Acts and Omissions.

## Policymaker

144.    Under Texas law, sheriffs are "final policymakers" in the area of law enforcement for the purposes of holding a county liable under § 1983. *James*, 577 F.3d at 617; citing *Williams*, 352 F.3d at 1013.

145.    Sheriff Henry Trochesset is the Galveston County Jail's final policymaker and has been delegated policy-making authority by the Galveston County Commissioners Court.

146.    As Sheriff, Trochesset was responsible for staffing the Galveston County Jail as he is the keeper of the jail.

147.    The sheriff of each county is the keeper of the county jail. The sheriff shall <u>safely</u> keep all prisoners committed to the jail by a lawful authority, subject to an order of the proper court. Tex. Loc. Gov't Code Ann. § 351.041.

148.    The sheriff has all the powers, duties, and responsibilities with regard to keeping prisoners and operating the jail that are given by law to the sheriff in a county operating its own jail. Tex. Loc. Gov't Code Ann. § 351.035.

149.    In the ten months that Mr. Williams had been in pod C200 of the Galveston County Jail, there had been at least seven other inmate-on-inmate assaults in that pod alone, which all occurred while there was only one officer assigned to the pod.

150.    Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate Lamar Turner was involved in <u>two</u> inmate-on-inmate assaults in pod C200 while there was only one officer supervising the pod.

151.    Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Mitchell" was involved in an inmate-on-inmate assault involving a weapon in pod C200 while there was only one officer supervising the pod.

152.    Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Bergus" was involved in an inmate-on-inmate assault in pod C200 while there was only one officer supervising the pod.

153.    Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Peanut" was involved in an inmate-on-inmate assault in pod C200 while there was only one officer supervising the pod.

154.    Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Mays" was involved in an inmate-on-inmate assault which resulted in his shoulder being broken in pod C200 while there was only one officer supervising the pod.

155.    Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Pee Wee" was involved in an inmate-on-inmate assault in pod C200 while there was only one officer supervising the pod.

156.    Each of these inmate-on-inmate assaults were stopped by Galveston County jailers; thus, the Galveston County Jail was aware of each assault.

157.    Upon information and belief, discovery into information within the knowledge of Defendant Galveston County will show more details regarding these seven inmate-on-inmate assaults.

158.    Upon information and belief, discovery into information within the knowledge of Defendant Galveston County will show that there were more inmate-on-inmate assaults in the Galveston County Jail while there was only one officer assigned to a pod, which put Galveston County on notice that their policy, custom, and practice of understaffing the jail pods with only one officer was failing to protect inmates in violation of their constitutionally protected rights under the Fourteenth and Eighth Amendments to the United States Constitution. *Morgan*, 335 F. App'x 466, 470 (5th Cir. 2009); quoting *Longoria*, 473 F.3d 586, 592 (5th Cir.2006).

159.    Had Sheriff Trochesset properly exercised his responsibilities as keeper of the jail, he would have been on notice that that inmate-on-inmate assaults continued to occur while there was only one officer assigned to the pod. *Hicks–Fields*, 860 F.3d at 808; Tex. Loc. Gov't Code Ann. §§ 351.041, 351.035.

160.    Thus, prior to October 20, 2018, Galveston County, through Sheriff Trochesset, was thus on notice that inmate-on-inmate assaults continued to occur while there was only one officer assigned to the pod.

**Policy, Custom, and Practice**
**Which was Moving Force of Constitutional Violations**

161.    Henry Trochesset, the Galveston County policymaker in charge of law enforcement and the Galveston County Jail, had an unconstitutional policy, custom, and practice of inadequate staffing at the Galveston County Jail, leaving extended periods of

time with only one jailer in each pod, which was inadequate to adequately protect the inmates in their custody, care, and control.

162.    The Fourteenth Amendment's Due Process Clause protects the rights of pretrial detainees. *Hare*, 74 F.3d at 639 (5th Cir. 1996).

163.    Detention center officials have a duty, under the Fourteenth Amendment, to protect the detainees in their custody. *Cantu*, 293 F.3d at 844 (5th Cir. 2002) (citing *Farmer*, 511 U.S. at 833 (1994)); *Bell*, 441 U.S. at 535, 545 (1979) (pretrial detainees retain at least those constitutional rights prisoners enjoy).

164.    Sheriff Trochesset attempted to appeal to his constituents by enacted staffing policies at the Galveston County Jail intended to "modif[y] Jail shift schedules to improve efficiencies and reduce overtime costs." Re-Elect Henry Trochesset for Sheriff, Accomplishments, http://henrytforsheriff.com/accomplishments/, (last visited Aug. 21, 2020).

165.    The method used by Sheriff Trochesset to "improve efficiencies and reduce overtime costs" was to understaff the Galveston County Jail by having only one officer in each pod, despite the increased risk to inmates.

166.    As Sheriff, Trochesset was aware that due to this Galveston County policy of understaffing, there were periods of time with only one officer supervising each pod – including pod C200.

167.    As Sheriff, Trochesset was aware that if there were not enough officers working in the jail so that there would be multiple officers supervising each pod – including pod C200 – then those pods would lack sufficient officer presence for deterring inmate assaults and quickly diffusing inmate altercations.

168.    Despite this knowledge, Sheriff Trochesset, intentionally understaffed the Galveston County jail in order to have a friendlier budget to help with his re-election bid, which meant that pods – including pod C200 – would frequently have only one pod officer.

169.    This staffing decision by Henry Trochesset caused there to be only one officer supervising pod C200 on October 20, 2018 when Mr. Williams was assaulted by inmate Smith.

170.    There was no legitimate governmental objective for there to be extended periods of time without adequate officer supervision in pods.

171.    There was no legitimate governmental objective for understaffing the jail.

172.    There was no legitimate governmental objective for only having one jailer in pod C200 at the time that Mr. Williams was assaulted in pod C200.

173.    These policies, practices, and customs were known and implemented by Galveston County's final policymaker – Henry Trochesset – not for a legitimate governmental objective, but to help him be re-elected as Sheriff by appealing to his constituents with a friendly Jail budget.

174.    These policies, practices, and customs were sufficiently well-known and pervasive to constitute the Galveston County policymaker's intended practices at the Galveston County Jail as the inadequate staffing at the Jail by only having one officer in pod C200 for monitoring and observing inmates was inadequate to protect the inmates, as there were at least seven other inmate-on-inmate assaults in pod C200 in the months leading up to Mr. Williams' assault.

175.     In the ten months that Mr. Williams had been in pod C200 of the Galveston County Jail, there had been at least seven other inmate-on-inmate assaults in that pod alone, which all occurred while there was only one officer assigned to the pod.

176.     Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate Lamar Turner was involved in <u>two</u> inmate-on-inmate assaults in pod C200 while there was only one officer supervising the pod.

177.     Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Mitchell" was involved in an inmate-on-inmate assault involving a weapon in pod C200 while there was only one officer supervising the pod.

178.     Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Bergus" was involved in an inmate-on-inmate assault in pod C200 while there was only one officer supervising the pod.

179.     Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Peanut" was involved in an inmate-on-inmate assault in pod C200 while there was only one officer supervising the pod.

180.     Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Mays" was involved in an inmate-on-inmate assault which resulted in his shoulder being broken in pod C200 while there was only one officer supervising the pod.

181.     Prior to Mr. Williams being assaulted by inmate Smith on October 20, 2018, inmate "Pee Wee" was involved in an inmate-on-inmate assault in pod C200 while there was only one officer supervising the pod.

182.     Each of these inmate-on-inmate assaults were stopped by Galveston County jailers; thus, the Galveston County Jail was aware of each assault.

183.    Upon information and belief, discovery into information within the knowledge of Defendant Galveston County will show more details regarding these seven inmate-on-inmate assaults.

184.    Upon information and belief, discovery into information within the knowledge of Defendant Galveston County will show that there were more inmate-on-inmate assaults in the Galveston County Jail while there was only one officer assigned to a pod, which put Galveston County on notice that their policy, custom, and practice of understaffing the jail pods with only one officer was failing to protect inmates in violation of their constitutionally protected rights under the Fourteenth and Eighth Amendments to the United States Constitution. *Morgan*, 335 F. App'x 466, 470 (5th Cir. 2009); quoting *Longoria*, 473 F.3d 586, 592 (5th Cir.2006).

185.    Thus, not only was this inadequate staffing the policy of the Galveston County Jail by way of final policymaker, Sheriff Trochesset, but it was the custom and practice at the jail as evidenced by the seven other inmate-on-inmate assaults in pod C200 alone during the months leading up to Mr. Williams' assault while there was only one officer in pod C200.

186.    This policy, practice, and custom was the proximate cause of the violation of Mr. Williams' 14th amendment right and the injuries he sustained from Galveson County's deliberate indifference toward his safety.

187.    It was foreseeable and likely this custom, practice, and policy would violate Mr. Williams' 14th amendment right and cause the types of injuries Mr. Williams suffered as there had been seven other inmate-on-inmate assaults in pod C200 alone in the monhs leading up to this assault, which occurred while there was only one jailer in the pod, which was a result of the policy, practice, and custom of understaffing the jail.

188.    As a direct, proximate, and foreseeable result of Galveston County's actions, which are attributed to Galveston County as he is the final policymaker for the county, Mr. Williams suffered injuries and damages, including, physical injuries, pain and suffering, permanent physical disfigurement, blindness, and mental anguish.

189.    Mr. Williams is entitled to relief against Galveston County because Sheriff Trochesset, as the final policymaker for Galveston County, was deliberately indifferent to Plaintiff's health and safety through the policy, practice, and custom described above.

## V.
## PUNITIVE DAMAGES

190.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

191.    When viewed objectively from the standpoint of Defendant Alvarez, at the time of the occurrence, Defendant Alvarez's conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

192.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendant Alvarez, Plaintiff is entitled to recover punitive damages against Defendant Alvarez in an amount within the jurisdictional limits of this Court.

## VI.
## DAMAGES

193.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

194.    Plaintiff's injuries were a foreseeable event due to the seven other inmate-on-inmate assaults in the months leading up to this assault and the fact that if an assault is allowed to continue the victim will sustain more damage than if the assault were stopped. Those injuries were directly and proximately caused by Galveston County's

deliberately indifferent and unconstitutional policy, practice, and custom, and Defendant Alvarez's deliberate indifference to Plaintiff's protection, health, and safety.

195.    As a result, Plaintiff is entitled to recover all actual damages allowed by law. Plaintiff contends Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to Plaintiff's constitutionally protected rights. Thus, Plaintiff is entitled to punitive damages against Defendant Alvarez.

196.    As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiff was forced to suffer:

      a.      Physical injuries;

      b.      Physical pain and suffering;

      c.      Permanent physical disfigurement;

      d.      Blindness, and

      e.      Emotional distress, torment, and mental anguish.

197.    Pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff seeks to recover, and hereby requests the award of punitive damages, reasonable attorney's fees, and costs of court.

### VII.
### ATTORNEYS' FEES

198.    If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. § 1988.

### VIII.
### JURY REQUEST

199.    Plaintiff respectfully requests a jury trial.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this court. Plaintiff further prays for all other relief, both legal and equitable, to which he may show himself justly entitled.

Respectfully submitted,

*/s/Scott H. Palmer*
SCOTT H. PALMER,
attorney-in-charge
Texas Bar No. 00797196
Federal ID No. 1751291
JAMES P. ROBERTS,
of counsel
Texas Bar No. 24105721
Federal ID No. 3244213

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF